IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 7, 2026 Session

## IN RE BRAVON K. [1]

**Appeal from the Juvenile Court for Wilson County**
**No. 21JT2, 20DN45        Charles B. Tatum, Judge**

_____

### No. M2024-01029-COA-R3-PT

_____

The father of the minor child appeals the termination of his parental rights. The paternal aunt and uncle, who sought custody of the minor child, appeal the denial of their motion to intervene. We affirm both decisions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., C.J., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Lorraine Wade, Smyrna, Tennessee, for the appellant, Jermale H.

Gere L. Beason, Nashville, Tennessee, for the appellants, Yushikau H. and Jesse H.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### FACTS AND PROCEDURAL HISTORY

Bravon K. ("Bravon") was born to Kayla K. ("Mother") in March 2018, in Nashville, Tennessee. The father was not identified on Bravon's birth certificate, but

_____

[1] This court has a policy of protecting the identity of children by initializing the last names of the children, parents, close relatives, and pre-adoptive parents and by not providing the children's exact birth dates.

Jermale H. ("Father") was residing with Mother prior to and during much of her pregnancy. Subsequent DNA testing proved that Father was the biological parent of Bravon.

In January 2019, Father was indicted for seven drug-related charges that he allegedly committed in January 2018—two months before Bravon's birth. The charges included possession of heroin within 1,000 feet of a school, possession of cocaine, possession of buprenorphine, possession of marijuana, possession of a firearm during the commission of a felony, possession of a firearm by a felon, and possession of drug paraphernalia.

A year later, in January 2020, the Department of Children's Services ("DCS") received a referral alleging that Bravon had been exposed to drugs. When DCS located Mother and Father, Father tested positive for THC and cocaine, and Mother tested positive for suboxone and cocaine. At the time, Bravon was staying at his maternal grandparents' home. But a background check revealed that the maternal grandmother had a criminal history, so Bravon was taken into DCS custody in March 2020. Due to the lack of other familial custodial options, Mother's positive drug screens, and Father not having established paternity, DCS placed Bravon in a foster home.[2]

At the time of removal, Bravon was two years old, nonverbal, dirty, and still being fed from bottles. In addition, Bravon was behind on vaccinations and medical check-ups and had four teeth that had to be extracted due to severe decay.

Shortly after removing Bravon, DCS filed a petition for temporary legal custody to initiate a dependency and neglect action. The juvenile court then entered an order removing Bravon from the legal custody of Mother and the physical custody of Father and awarding custody to DCS. After that, Father's sister, Yushikau H. ("Aunt"), asked DCS to place Bravon with her and her husband, Jesse H. ("Uncle"). DCS denied her request, noting that Father had not yet established paternity and that Aunt and Uncle resided out-of-state. Nevertheless, Aunt and Uncle were granted visits with Bravon and continued to correspond with DCS. Aunt and Uncle also monitored the legal proceedings in the dependency and neglect action and this termination action, with the hope of obtaining custody, if not adoption, of Bravon.

Soon thereafter, the juvenile court approved a family permanency plan ("FPP" or "permanency plan") that required Father to complete a paternity test; remedy the conditions that necessitated foster care; complete a drug and alcohol assessment; provide DCS with

---

[2] Neither Father nor his relatives were a placement option because Father had not yet proven (by taking a DNA test) that he was the biological father. DCS also considered placing Bravon with Mother's relatives, but her relatives were deemed unacceptable following background checks.

proof of housing; provide DCS with information on everyone living in his home so DCS could perform background checks; allow DCS to do a walk-through of the home; resolve all legal charges and not accrue anymore criminal charges; complete a parenting assessment and follow all recommendations; provide DCS with proof of stable and legal income; provide proof of legal transportation; and maintain communication with DCS.[3]

Genetic testing established Father's parentage in June 2020.[4] At the time, Father was living with a romantic interest, Shonda White, and Mother's mother. Then, that same month, Father pleaded guilty to and was incarcerated for three of the crimes he committed in 2018, shortly before Bravon's birth: criminal attempt to possess schedule I drugs; possession of schedule II drugs (cocaine); and unlawful possession of a weapon by a convicted felon. Father was sentenced to a total of 8 years in prison, with one year to be served day-for-day and the other seven to be served on supervised probation. In addition, Father pleaded guilty to misdemeanor domestic assault for an altercation with Mother that occurred in May 2020, approximately two months after Bravon's removal, and he was sentenced to 11 months and 29 days in jail, to be served concurrently with his other convictions.

Father began exercising parenting time while he was incarcerated. Then, in October 2020, the trial court ruled that Father was not in compliance with the FPP due, in part, to his incarceration.

In February 2021, DCS commenced this action by filing a petition for termination of parental rights against Mother and Father.[5] The petition asserted multiple grounds for terminating Father's rights, including abandonment by incarcerated parent/wanton disregard, substantial noncompliance with the permanency plan, and failure to manifest an ability and willingness to assume custody.

Shortly thereafter, in March 2021, Aunt and Uncle filed a motion to intervene in the dependency and neglect action, which was denied.

After his release in June 2021, Father gained employment and housing. At first, Father stayed at a halfway house, but he was evicted within two months because he violated curfew. Father then moved back in with his romantic interest, Ms. White, where he stayed until he moved by himself to an apartment in Shelbyville, Tennessee. However, Father lost both his job and his apartment after being arrested again in February 2022. Father spent

---

[3] Two substantially similar permanency plans were created and ratified, the first on April 6, 2020.

[4] The order establishing paternity was not entered until October 2020.

[5] Because Mother does not appeal the termination of her parental rights, we will not discuss facts or issues that pertain only to Mother.

one month in jail before the charges were dismissed. After being released, Father started living with his fiancée, Sherrill McGill, their son Jermale, and Ms. McGill's two children from a previous relationship.

A trial on the termination petition was held over multiple days between September 2023 and February 2024. The court heard testimony from 17 witnesses, including Father; Father's prior romantic partner, Shonda White; DCS child protective services team leader Patrick Cockburn; Omni Visions visitation supervisor Angela Hilliard; Wilson County DCS court liaison Elizabeth Johnston; the court appointed special advocate and supervisor, Ann Marie Nordgren; Health Connect America supervisor for therapeutic visitations Natasha Austin; the owner of ReliaLab, Greg Bowman; Health Connect America family support specialist Sarah Klobuchar; Bravon's foster parents, Daniel R. and Toni M.; DCS case manager Stacey McPheeters; Father's probation parole officer, Charles Landon Thompson; licensed psychologist Janie Berryman, Ed.D.; criminal defense lawyer Charles Buckholts; DCS contract provider Adriene Stewart; and Aunt.

Much of the testimony at trial focused on Father's criminal history, housing, and involvement with Mother and Bravon. Father testified that he knew Mother was pregnant with Bravon by January 2018, if not before, and he knew when Bravon was born in March of 2018. Father said he was not certain whether he was Bravon's biological father at the time, but he knew he could be. The evidence also showed that Father repeatedly tested negative for illicit substances after his release from prison in June of 2021.

Father further testified that he had maintained employment since the first parenting plan was approved, except for when he was incarcerated. At the time of trial, Father worked for a "temp agency" cleaning machines. Father testified that he worked for the agency from 10:30 a.m. to 7:30 p.m., seven days a week, for $16.50 an hour. But DCS representatives testified that they were unable to verify Father's alleged employment because Father's paychecks did not include his hours, his wage, or any garnishments, and Father stopped providing DCS with his paychecks after the trial started in September 2023.

DCS representatives also testified that Ms. McGill's apartment did not have sufficient space for Bravon to live there. Moreover, although Father claimed that Ms. McGill would be a caretaker for Bravon while Father worked, Father admitted that Bravon was a stranger to Ms. McGill and her children. Father also testified that he had not discussed his plans with Ms. McGill. And DCS representatives testified that all of Father's past residences, except for the Shelbyville apartment, were unsuitable for Bravon.

The evidence at trial also established that Father had seven children, each of whom had a different mother, and that Father had never been the primary caregiver for any of them. Father testified that he paid child support for four of his other children but was in arrears.

After Bravon's removal, when Bravon was almost two, Father had Zoom calls and visits with Bravon, and while he was incarcerated from June 2020 to June 2021, Father talked to Bravon approximately twenty times over the phone during the 12 months. Thereafter, from July 2021 to the time of trial, Father had two-hour weekly visits with Bravon, the quality of which varied.

On December 8, 2023, three months after the trial started, Aunt and Uncle filed a motion to intervene in this termination action for the limited purpose of seeking temporary custody of Bravon. The trial court denied the motion, and the case proceeded.

Following the conclusion of the trial, the court took the matter under advisement. In a final order entered on August 28, 2024, the trial court found that DCS proved three grounds for termination: (1) abandonment by incarcerated parent/wanton disregard, (2) substantial noncompliance with the permanency plan, and (3) failure to manifest an ability and willingness to assume custody. The court also found that termination of Father's parental rights was in Bravon's best interest. Accordingly, the court granted the petition terminating Father's parental rights and placing Bravon in the full guardianship of DCS. Father then filed a motion to set aside the judgment or for a new trial, which the court denied.

This appeal followed.

## ANALYSIS

### I. AUNT AND UNCLE'S MOTION TO INTERVENE

Aunt and Uncle argue that the trial court improperly denied their motion to intervene in Father's parental termination trial because there was no hearing and the trial court failed to make findings of fact or conclusions of law when denying the motion.

"[S]tanding to intervene in a termination proceeding in juvenile court should be analyzed under Rule 24 of the Rules of Civil Procedure." *Gonzalez v. State Dep't of Children's Servs.*, 136 S.W.3d 613, 617 (Tenn. 2004). Rule 24 provides "two ways by which a person may intervene in an action. Rule 24.01 provides for intervention as of right, such as when a statute confers an unconditional right to intervene; while Rule 24.02 provides for permissive intervention in certain situations." *Shelby Cnty. Deputy Sheriff's Ass'n v. Gilless*, 972 S.W.2d 683, 685 (Tenn. Ct. App. 1997). Aunt and Uncle do not contend that they had an unconditional right to intervene; thus, Aunt and Uncle's motion was subject to Rule 24.02, which states:

> Upon timely motion any person may be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when a movant's claim or defense and the main action have a question of law or fact in common.

Tenn. R. Civ. P. 24.02.[6]

Aunt and Uncle contend that Rule 24 requires an evidentiary hearing on a motion for intervention and a ruling that includes findings of fact and conclusions of law. We disagree, finding no such mandate in the rule. We also note that Tennessee Rule of Civil Procedure 52.01 requires findings of fact and conclusions of law only in "actions tried upon the facts without a jury," and a hearing on a motion to intervene does not constitute an action tried upon the facts.

For this reason, we find no error with the trial court's decision to deny the motion to intervene without conducting a full evidentiary hearing and making findings of fact and conclusions of law. With that issue decided, we turn our attention to issues related to the termination of Father's parental rights.

## II. GROUNDS FOR TERMINATION

To terminate parental rights, a court must find that at least one statutory ground for termination has been proven by clear and convincing evidence. *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016) (citing Tenn. Code Ann. § 36-1-113(c)). Here, the trial court found that DCS proved three grounds: (1) abandonment; (2) substantial noncompliance with the permanency plan; and (3) failure to manifest an ability and willingness to assume custody.[7]

## A. Abandonment

Father contends the trial court erred by (1) citing multiple subsections of the termination statute without identifying which subsection it was applying, and (2) by

---

[6] Aunt and Uncle argue, in passing, that "their Motion to Intervene in the Termination of Parental Rights action, docket No. 21JT2, in which an Intervening Petition was attached as Exhibit 'A', sets out what they deem as their claim to the main action having a common question of law or fact." But their appellate brief provides no further analysis. Consequently, we find Aunt and Uncle have waived this issue. *See Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006) ("A skeletal argument that is really nothing more than an assertion will not properly preserve a claim, especially when the brief presents a multitude of other arguments." (citation omitted)); *In re Est. of Espey*, 729 S.W.2d 99, 103 (Tenn. Ct. App. 1986) ("We may decline to consider an issue that is only touched upon in the argument for other issues."); *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.").

[7] All statutory citations are to the version of the statute in effect at the time the petition was filed unless otherwise specified.

concluding that Father engaged in conduct that exhibited a wanton disregard for Bravon's welfare.

### 1. Applicable Definition of Abandonment

One of the grounds for termination of a parent's parental rights is "abandonment by the parent or guardian, as defined in § 36-1-102." Tenn. Code Ann. § 36-1-113(g)(1). Section 36-1-102 provides five definitions of "abandonment."

Under the first, abandonment occurs when the parent failed to visit or support the child "[f]or a period of four (4) consecutive months immediately preceding the filing of [the] petition." *Id*. § 36-1-102(1)(A)(i). Under the second, abandonment occurs when the parent has not provided, and will not likely be able to provide, "a suitable home for the child at an early date." *Id*. § 36-1-102(1)(A)(ii). Under the third, abandonment occurs when a father "has either failed to visit or failed to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child." *Id*. § 36-1-102(1)(A)(iii). Under the fourth, abandonment occurs when the parent was incarcerated either at the time the petition was filed or during the immediately preceding four months, and the parent failed to visit or support the child or "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." *Id*. § 36-1-102(1)(A)(iv). And under the fifth definition, abandonment occurs when a mother voluntarily delivers the child to a medical or emergency services facility and then fails to take steps to be reunited within 90 days. *Id*. § 36-1-102(1)(A)(v).

In its petition, DCS asserted five grounds for terminating Father's parental rights. The headings for the first and second grounds appear as follows:

GROUND I.
ABANDONMENT—FAILURE TO PROVIDE SUITABLE HOME
T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)

. . .

GROUND II.
ABANDONMENT BY INCARCERATED PARENT/WANTON
DISREGARD
T.C.A. §§ 36-1-113(g)(1) and
36-1-102(1)(A)(iv), -102(1)(B), -102(1)(C), -102(1)(C), -102(1)(D)
and -102(1)(E)

In its final order, the trial court reused the same headings. Based on this fact alone, Father complains that the court "did not expressly state which of the five definitions of abandonment it was relying on in either ground."

We find this argument to be without merit. The trial court clearly identified the statutory subsection on which it based its finding of abandonment, holding that DCS had "proven, by clear and convincing evidence, the ground of abandonment by incarcerated parent/wanton disregard against [Father]." Moreover, the addition of statutory definitions that are not used does not change the gravamen of the court's findings. *See In re Nevaeh B.,* No. E2019-01539-COA-R3-PT, 2020 WL 1527001, at \*4 (Tenn. Ct. App. Mar. 31, 2020) ("The trial court's isolated reference to irrelevant statutory subsections does not change the substance of the trial court's findings.").

For this reason, we find no error with the trial court's identification of the statutory subsection on which it was relying.

### 2. Wanton Disregard

Next, Father contends that the trial court erred by finding that he engaged in conduct that exhibited a wanton disregard for Bravon's welfare because "[t]he court relied on [Father's] criminal history but failed to establish that this history alone proves wanton disregard."

As stated, the court expressly found that DCS proved the ground of abandonment based on Father's pre-incarceration conduct. Thus, the relevant definition of abandonment is provided under Tennessee Code Annotated § 36-1-102(1)(A)(iv):

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> .    .    .
>
> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, **or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has** . . .
>
> .    .    .
>
> (*c*) . . . **engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child** . . . .

*Id*. (emphasis added).

While incarceration alone is not a ground for termination, the statute recognizes that parental incarceration is a strong indicator that the welfare of the child may be threatened, and it allows the court to take a closer look at the child's overall circumstances to determine if termination is warranted. *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). The courts are not confined to considering only the four-month period preceding incarceration. *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009).

Here, Father was incarcerated from June 2020 to June 2021, and the petition to terminate his parental rights was filed in February 2021. Thus, Father was incarcerated for the four months immediately preceding the filing of the termination petition. Moreover, Father engaged in conduct prior to his incarceration that exhibited a wanton disregard for Bravon's welfare. In particular, Father was charged with and pleaded guilty to multiple felony drug and weapons offenses for crimes committed in January 2018 while Bravon was in utero, and Father pleaded guilty to a domestic assault charge stemming from an incident that occurred in May 2020, after Bravon was born. Additionally, Father had positive drug tests in May and June 2020, and he was charged with additional drug-related activities in 2022 that led to a one-month incarceration.

In summary, the facts in the record and those found by the trial court in its final order prove by clear and convincing evidence that Father was incarcerated during all of the four consecutive months immediately preceding the filing of the petition in this action, and that he engaged in conduct prior to incarceration that exhibited a wanton disregard for the welfare of Bravon. These facts satisfy the essential elements of abandonment under Tennessee Code Annotated § 36-1-102(1)(A)(iv). Therefore, we affirm the trial court's finding that the ground of abandonment by an incarcerated parent/wanton disregard was proven by clear and convincing evidence.

### B. Substantial Noncompliance with Permanency Plan

The trial court also found that DCS proved the ground of substantial noncompliance with the permanency plan because Father failed to prove that he had stable housing.

Under Tennessee Code Annotated § 36-1-113(g)(2), a court may terminate parental rights when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." To prove this ground, a petitioner must show that the requirements of the permanency plan were reasonable and related to remedying the conditions that necessitate foster care. *See* Tenn. Code Ann. § 37-2-403. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 656–57 (Tenn. Ct. App. 2004) (citation omitted). Further, improvement toward compliance may be considered in a parent's favor. *See State Dep't of Hum. Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996). "Substantial noncompliance is a question of law which

we review de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002).

DCS created two FPPs for Father before petitioning to terminate his parental rights. The plans required Father to complete a paternity test; remedy the conditions that necessitated foster care; complete a drug and alcohol assessment; provide DCS with "verification of housing via lease"; provide DCS with information on everyone living in his home so DCS could perform background checks; allow DCS to do a walk-through of the home; resolve all legal charges and not accrue anymore criminal charges; complete a parenting assessment and follow all recommendations; provide DCS with proof of stable and legal income; provide proof of legal transportation; and maintain communication with DCS. The trial court found that the requirements in the FPP were reasonable and related to remedying the conditions that necessitated foster care. Because the requirements are related to Father being able to provide a safe and stable environment for Bravon, we agree.

As for Father's compliance, it was undisputed that Father successfully completed some of the tasks in his FPP. But the court found that he did not adequately complete others. Particularly, the trial court focused on Father's housing issues as the basis for its finding of substantial noncompliance. The trial court held:

> As to [Father], the Court finds that he exercised visitation with Bravon. He maintained contact with DCS. He was gainfully employed and was not homeless. He provided pay stubs. However, in looking at [Father's] priorities on the plan, it was critical that he establish a residence and permit DCS to investigate the home. This effort was frustrated by [Father's] insistence that Ms. McGill and her landlord not be involved in these proceedings. This was an important and substantial task on the [Father's] permanency plan. Further, his failure to complete this task amounts to substantial noncompliance with the permanency plan.

We find no error in the trial court's findings or its conclusion that Father was in substantial noncompliance with the FPPs. The evidence at trial established that Father was living with a romantic partner, Ms. White, at the time of Bravon's removal from Father's physical custody. After Father's year-long incarceration, he began living in a halfway house. When Father lost that housing, he began living in an apartment in Shelbyville, Tennessee. Unfortunately, Father lost the apartment due to a subsequent arrest, for which the charges were dropped a month later. However, by the time of the trial regarding the termination of his parental rights, Father had been living in the same apartment for more than 18 months with his fiancée, Ms. McGill. Nonetheless, Father did not provide DCS with a written lease or other written proof of his right to reside there. According to Father, Ms. McGill was the only name on the lease, and he paid rent to Ms. McGill under an oral agreement. But Father did not call Ms. McGill or the landlord to testify, and Father told DCS that he did not want Ms. McGill or the landlord to be involved in the proceedings.

As stated, trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re M.J.B.*, 140 S.W.3d at 656–57 (citation omitted). While the failure to provide proof of a written lease may or may not be a minor failure to comply with the permanency plan, whether a parent has housing that is safe, suitable, and dependable for a child is not trivial. Thus, the uncertainty of Father's right to reside with Ms. McGill, and, more importantly, for Bravon to also reside there, is significant.

As the trial court noted, Ms. McGill was the tenant of the apartment, not Father. But Ms. McGill did not testify. Indeed, she never attended a hearing, of which there were many. This is significant because, as Father testified, he expected Ms. McGill to be very involved in caring for Bravon while in his custody. Moreover, Father admitted that Bravon was a stranger to Ms. McGill and that he had not discussed his plans with Ms. McGill. Thus, Father failed to establish that he had obtained safe, suitable, and dependable accommodations for Bravon to reside with him.

Father's failure to provide proof of housing that was safe, suitable, and dependable for Bravon constitutes a substantial noncompliance with the permanency plan. Accordingly, we affirm the trial court's holding that DCS proved this ground by clear and convincing evidence.

### C. Failure to Manifest an Ability and Willingness

The trial court also found that DCS proved by clear and convincing evidence that Father failed to manifest an ability and willingness to assume custody or financial responsibility of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14). Father contends this was error.

Parental rights may be terminated when

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*Id*. § 36-1-113(g)(14). This is a two-part test, and both prongs must be proven by clear and convincing evidence to terminate parental rights on this ground. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

First, the petitioner must prove "by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness." *Id*. (citing *In re Amynn K.*,

No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome the obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019).

Second, the petitioner must prove that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). We have previously explained that the circumstances that pose a risk of substantial harm "are not amenable to precise definition because of the variability of human conduct." *In re Greyson D.*, No. E2020-00988-COA-R3-PT, 2021 WL 1292412, at *8 (Tenn. Ct. App. Apr. 7, 2021) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). But the modifier "substantial" indicates that the risk must be both "a real hazard or danger that is not minor, trivial, or insignificant," and "more than a theoretical possibility." *Id.* (quoting *Ray*, 83 S.W.3d at 732).

Concerning the first prong, the trial court found that Father failed to manifest an ability and willingness to assume custody because he did not demonstrate that he was "capable of being adaptable, flexible, [and] willing to take initiative or to take the steps needed for a child to thrive." In particular, the court held that Father's "pattern of behavior, conduct, testimony, level of engagement during visits and his description of Bravon's accomplishments" did not show that Father was "capable of being able to care for Bravon at all times." We agree with the court's conclusion.

The evidence at trial showed that Father did not establish paternity for Bravon until after removal. Before parentage was legally established, Father began visitation while he was incarcerated and continued supervised visitation after his release, up until the time of his trial. While Father never missed a visit, the quality of the visits was inconsistent. Some visits went well, with Father being engaged and responsive, while at others Father merely observed as Bravon played independently or with others. Father appeared to have affection for Bravon, but the quality of the visits did not improve over time, nor did the bond between Father and Bravon. When asked questions about Bravon, Father often did not have answers about Bravon's particular interests and preferences. Bravon was reluctant to attend many of the visits and called Father "the visit guy." Moreover, Father did not have clear plans on how he would provide care for Bravon in the future. The lack of a plan was particularly concerning, considering Father had several other children over whom he did not exercise custody.[8] Indeed, Father never asked to increase his visitation or have unsupervised visits. Thus, we agree with the trial court's finding that Father failed to manifest an ability and willingness to assume custody of Bravon.

---

[8] Father testified that he had seven children, but he only named three of them during the trial of this case.

As for the second prong of the test, "risk of substantial harm," the trial court found the following:

> The Court finds that [Father] holds himself out to be the father of seven children. However, the Court was only ever made aware of three of these children. The Court finds that, if [Father] is to be believed, he is under an order to pay child support for children that are not definitively his children. There was no proof offered that [Father] is capable of being a single parent to care for any of these children. The Court is not finding that [Father] does not have a connection to these children. However, the Court does find that [Father] is not responsible for the day-to-day care of any of these seven other children. Rather, the care of all of these children has fallen on the shoulders of other people.

> .    .    .

> . . . The Court finds that children present challenges every day, which can include needing assistance with homework or help with laundry. [Father] has never been in a position, solely on his own and without the significant assistance of someone else, to care for any of his children for a significant period of time. The Court finds that [Father] would not cause physical harm or emotion[al] abuse to the child. However, he has not demonstrated a pattern of behavior over the last few years that he can be a proactive parent under any circumstance.

Based on these and other findings, the trial court concluded that "[p]lacing the child in [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." We agree.

### III. Best Interest Analysis

Once a court has found clear and convincing evidence of one or more grounds for termination, "the interests of parent and child diverge." *In re Jude M.*, 619 S.W.3d 224, 244 (Tenn. Ct. App. 2020) (citations omitted). "While the parent's interests do not evaporate upon a finding of unfitness, the focus of the proceedings shifts to the best interests of the child." *In re Audrey S.*, 182 S.W.3d at 877 (citation omitted).

"Facts considered in the best interest analysis must be proven by 'a preponderance of the evidence, not by clear and convincing evidence.'" *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citations omitted). After a court makes its factual findings regarding

the grounds for termination, it must consider the combined weight of the best interest factors to determine whether it amounts to clear and convincing proof that termination is in the child's best interests. *See id.*; *see also In re Kaliyah S.*, 455 S.W.3d 533, 555–56 (Tenn. 2015).

In determining whether termination of parental rights is in a child's best interest, courts must consider the non-exhaustive list of statutory factors in Tennessee Code Annotated § 36-1-113(i)(1). *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). These statutory factors are not exclusive, and courts are free to consider any other proof offered at a termination proceeding that is relevant to the best interest analysis. *In re Neveah M.*, 614 S.W.3d at 679 (citations omitted).

Father argues on appeal that the trial court erred by applying an incorrect version of the best interest factors found in Tennessee Code Annotated § 36-1-113(i)(1). The termination petition was filed on February 25, 2021, but the trial court applied an amended version of the best interest factors that became effective April 22, 2021. We find any error in this regard was harmless because the factors that were in place in February 2021 were included in the April 2021 factors. *See In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022) (finding no reversible error when the court applied newer version of statute that incorporated factors from old statute). Moreover, the factors in § 36-1-113(i) are nonexclusive, and "courts are free to consider any other proof offered at a termination proceeding that is relevant to the best interest analysis." *In re Emory S.*, No. E2024-00628-COA-R3-PT, 2025 WL 1445761, at *5 (Tenn. Ct. App. May 20, 2025) (citing *In re Neveah M.*, 614 S.W.3d at 679).

We also agree with the merits of the trial court's finding that termination of Father's parental rights was in Bravon's best interests. The factors in § 36-1-113(i), as amended, generally fall into three categories: (1) those related to the child's emotional needs; (2) those related to the child's general needs, physical environment, and wellbeing; and (3) those related to Father's efforts.

We consider first Bravon's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability); *id.* § 113(i)(1)(B) (concerning how changes in caretakers affect wellbeing); *id.* § 113(i)(1)(C) (concerning continuity and stability in meeting Bravon's basic material, educational, housing, and safety needs); *id.* § 113(i)(1)(D) (concerning the parent-child attachment); *id.* § 113(i)(1)(E) (concerning visitation); *id.* § 113(i)(1)(H) (concerning attachment to others); and *id.* § 113(i)(1)(I) (concerning relationships with others).

With respect to these factors, the evidence in the record shows that Bravon has been with the same foster family since March 2020, when he was two years old, and that he was seven years old at the time of trial. Significantly, he has developed a strong, healthy bond with his foster parents and foster siblings. Bravon is also thriving in school and has

expressed that he wishes to stay with his foster family. The trial court found that a change in this environment would have a "negative effect on Bravon's emotional, psychological, and/or medical condition." In contrast with the foster family, the trial court found that Father had not provided continuity or met the daily needs of Bravon. Further, the parental bond between Father and Bravon was inconsequential and insufficient to create a healthy attachment in the future. While Father did participate in all his visits, he did not seek to expand visitation.

We turn next to Bravon's general needs, physical environment, and well-being. *See id*. § 36-1-113(i)(1)(N) (concerning abuse or neglect); *id*. § 113(i)(1)(O) (involving the parent's prior provision of safe and stable care to Bravon or any other child); *id*. § 113(i)(1)(P) (whether the parent has demonstrated an understanding of the basic and specific needs required for Bravon to thrive); *id*. § 113(i)(1)(Q) (whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets Bravon's basic and specific needs required to thrive); and *id*. § 113(i)(1)(S) (addressing the parent providing more than token support).

With respect to these factors, the trial court found that Father was not capable of being a single parent to Bravon based on the general lack of "one-on-one" and "day-to-day" care Father has provided to Bravon and Father's other children. Father has several other children and has not exercised custody over any of them. In general, Father failed to demonstrate the ability and commitment or the understanding needed to create and maintain a home that meets Bravon's basic and specific needs and in which Bravon can thrive.

Next, we consider Father's efforts. *See id*. § 36-1-113(i)(1)(M) (concerning the parent's sense of urgency in seeking custody). The trial court found that Father has not exhibited a sense of urgency in expanding contact with Bravon, who had been in foster care for over four years by the time of the termination trial.

After considering the relevant factors and the combined weight of these factors, the trial court concluded DCS had proven by clear and convincing evidence that it was in the best interest of Bravon that the parental rights of Father be terminated. Having conducted our own de novo review of the record, we have determined that the evidence preponderates in favor of the trial court's factual findings. We also hold that the combined weight of the relevant factors amounts to clear and convincing evidence that termination of Father's parental rights is in the best interest of Bravon. *See In re Carrington H.*, 483 S.W.3d at 535; *see also In re Kaliyah S.*, 455 S.W.3d at 555–56. Accordingly, we affirm the trial court's determination that termination of Father's parental rights is in Bravon's best interest.

## IV. FUNDAMENTAL RIGHT TO A FAIR TRIAL

Father also contends that his fundamental right to a fair trial was violated by multiple errors, and, as a result, the order terminating his parental rights should be reversed.[9] For the reasons explained below, we find this issue waived.

"In order for an issue to be considered on appeal, a party must, in his brief, develop the theories or contain authority to support the averred position as required by Tennessee Rules of Appellate Procedure 27(a)." *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). "Where a party makes no legal argument and cites no authority in support of a position, such issue is deemed to be waived and will not be considered on appeal." *Id*. (quoting *Branum v. Akins*, 978 S.W.2d 554, 557 n.2 (Tenn. Ct. App. 1998)).

"It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Pro. Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). A party's failure to comply with these rules "waives the issues for review." *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000).

Tennessee Rule of Appellate Procedure 27(a)(7) provides the requirements for briefing issues on appeal. The rule states in pertinent part:

> The brief of the appellant shall contain under appropriate headings and in the order here indicated:
>
> > (7) An argument, which may be preceded by a summary of argument, setting forth: (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and (B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues) . . . .

While Father raised the broad issue of fundamental fairness, his generic claims were not supported by a properly developed argument in his appellate brief. Father's various

---

[9] The issue reads, "Was [Father's] fundamental right to a fair trial violated due to multiple errors during trial?"

issues in the brief are presented in a manner that is more analogous to a list rather than a reasoned argument that cites the record, proper authorities, and the standard of review.

It is the responsibility of the litigant to properly develop his arguments. *Sneed*, 301 S.W.3d at 615. Even issues that are specifically raised may be waived when the appellate brief fails to meet the requirements stated in Tennessee Rule of Appellate Procedure 27(a)(7). *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012). Because the issue of fundamental fairness was not supported with an argument as required under Rule 27(a)(7), the issue is waived.

## In Conclusion

Because we have affirmed the trial court's determination that a ground for termination of Father's parental rights was proven and that termination of Father's parental rights is in Bravon's best interest, we affirm the termination of Father's parental rights to Bravon.

Accordingly, we affirm the judgment of the trial court. Costs of appeal are assessed against the appellant, Jermale H.

_____
FRANK G. CLEMENT JR., C.J.